Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 14 2015, 9:26 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**CHRISTOPHER C. CRAWFORD**
Elkhart, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHERINE MODESITT COOPER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ADAM WHITE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 20A05-1404-CR-187 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ELKHART SUPERIOR COURT
The Honorable Evan S. Roberts, Judge
Cause No. 20D01-1309-FC-218

**January 14, 2015**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Following a jury trial, Adam White appeals his conviction for Class C felony battery committed by means of a deadly weapon or resulting in serious bodily injury,[1] and he raises two issues that we consolidate and restate as: whether the trial court erred when it excluded evidence, namely certain testimony by a police officer regarding aspects of the investigation and testimony by White and his girlfriend regarding White's pre-existing medical condition at the time of the incident.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On September 10, 2013, Rolando Canchola ("Canchola") lived in a home on the corner of Jackson Place and Brady Street in Elkhart, Indiana. In the late afternoon or early evening hours that day, Canchola gathered with a few friends, all male adults, in a lot by his house to socialize and drink beer. One of the men in the group was known as Manny. Earlier that afternoon, Manny had dropped off his daughter at White's house to play with White's 9-year-old son, as they were about the same age and were friends. At some point in the early evening, White decided to walk to a nearby QuickStop store, and he stopped at the vacant lot where Canchola and the other men were gathered to tell Manny that he was leaving his house but that his girlfriend,[2] Tamara McKenzie ("McKenzie"), was at home supervising the children. One of the men in the group, known as Juan, told White to be

---

[1] *See* Ind. Code § 35-42-2-1(a)(3). We note that, effective July 1, 2014, a new version of this criminal statue was enacted. Because White committed his crime in 2013, we will apply the statute in effect at that time.

[2] Although not married, White and McKenzie had been in a relationship for twenty years and are the parents of three children.

quiet and to leave. According to White, Juan or someone punched him in the face. During the time that Juan and White were arguing, Canchola was inside his house, and when he came back out, White was gone. White had returned to his home and told McKenzie what had happened.

McKenzie was upset, particularly because White had a medical condition and she felt the men were picking on White because of it. She decided to return to the lot and confront the men. Canchola saw McKenzie walking from the street to the alley near the vacant lot. White followed shortly behind her. The group of men were still gathered in the lot. Canchola heard White and McKenzie "yelling things" as they approached, and he observed that White was carrying two big knives. *Tr.* at 261-62. A fight immediately ensued. According to McKenzie and White, someone threw a bicycle at McKenzie, four or five times. White stabbed Canchola in the right side of his stomach, and according to Canchola, White threatened that he was going to kill Canchola. Juan hit White with a large stick, perhaps from a fence and similar in size to a 2x4 piece of lumber. Canchola feared White was going to stab him again, so he threw one or more large rocks at White. McKenzie and White ran home. Canchola, who was bleeding, remained outside on the sidewalk, and his girlfriend's son called police.

At about 7:00 p.m., Corporal Jason Tripp of the Elkhart Police Department responded to a dispatch call to the area of Jackson Place and Brady Street. Upon arrival, he parked his car and began walking north on Brady Street when he encountered Canchola, who was bleeding and clutching his stomach. Canchola told him that he had been stabbed by a black male wearing a white t-shirt and that the suspect had headed north on Brady

3

Street. Corporal Tripp observed chairs beneath a tree in the vacant lot and some empty beer bottles, and he saw a bicycle in the street. Officers at the scene learned that there was a female involved, who they later learned was McKenzie, and that the first name of the suspect who stabbed Canchola was possibly "Adam." *Id*. at 117. Corporal Tripp located McKenzie, who was distraught, but he observed no injuries to her. Corporal Tripp asked her if she knew "Adam," and McKenzie said that White lived there at the residence, but that she did not know where he was, other than he had run westbound. *Id*. at 121. McKenzie consented to a search of the residence, and Officer Jason Gruber located White hiding in the basement crawl space. White told police that he had been attacked by a group of Hispanic men and that he stabbed one of them with a stick. White did not request medical treatment when apprehended. However, he did so later, while at the police station, at which time he was transported to the hospital for treatment for cuts and bruises.

Meanwhile, Canchola was transported from the scene to the Elkhart Hospital. He was released that same night, but returned the following day, feeling ill, to learn that his liver had been lacerated. Corporal Tripp learned from Canchola and other witnesses that before and after the fight, White was carrying "Chinese style" knives. *Id*. at 131. Corporal Tripp obtained a search warrant for White's residence and found two large knives matching that description under a bed. Corporal Tripp observed what appeared to be blood on the knives.

The State charged White with Class C felony battery committed by means of a deadly weapon. At the jury trial, the State presented the testimony of several witnesses who observed White walking toward the vacant lot carrying one or two "longer knives" or

4

what looked like blades or shiny scissors crossed behind his back. *Id.* at 182-83, 214, 234-35. The witnesses testified that White did not seem injured or ask for help.

Corporal Andrew Chrobot testified that, in his capacity as the evidence technician at the scene, he took various photographs, including one of a bicycle in the street. He testified that in the photograph where he is seen holding a ruler, he intended to illustrate "the size of the tire treads." *Id.* at 346. White's counsel moved to admit the photograph of the bike and ruler, but the State objected on relevancy grounds and, after some discussion, the trial court sustained the objection. Later, when counsel for White further inquired about the ruler and its significance or purpose, the State again objected, primarily on relevancy grounds. After discussion between counsel and the court, White's counsel agreed to "leave it alone" with Corporal Chrobot, but would revisit the issue when McKenzie testified about the bike being thrown at her. *Id.* at 357. The trial court thus did not rule on the objection.

Before McKenzie testified at trial, the State made an oral motion in limine to exclude any testimony by McKenzie that concerned White's pre-existing medical condition that required him to wear a colostomy bag, arguing such evidence was not relevant. White's counsel argued that it was relevant to his self-defense claim because it explained why McKenzie was so angry about the initial altercation, and why she wanted to confront the men about picking on White, who they knew had this condition. The trial court ruled that McKenzie could testify that White had medical "issues," but precluded her from further elaborating or discussing the colostomy aspect. *Id.* at 417. The State later made the same motion in limine with regard to White's testimony, which the trial court granted, prohibiting both McKenzie and White from testifying about the existence of a

5

colostomy bag or related medical conditions.

During McKenzie's testimony, she presented her version of events, which was that White went in and out of the house two or three times after she got home from work, and the last time White returned, he was "distraught" and told her that he had been "jumped on," but McKenzie did not observe any injuries to White. *Id.* at 431, 487. McKenzie decided to go back to the vacant lot to "take care of the issue" and determine why they would "jump on" White when they knew he "had issues." *Id.* at 471, 488. She testified that while she was speaking to Canchola, another man threw the bike at her. Photographs of the bike and McKenzie were admitted, for the purpose of showing bike tread marks on her shirt, hand, wrist and head, from where the bike had hit her. McKenzie did not observe what happened between Canchola and White and thus did not know which of the two men was the aggressor. McKenzie testified that the "decorative knives" or "daggers" that police discovered under the bed had been boxed and were normally stored in the garage. *Id.* at 497-98.

White also testified, and he asserted that he acted in self-defense when he stabbed Canchola. He testified that, as he was following McKenzie back to the vacant lot, he saw someone pick up a bike, but did not see the individual throw it at McKenzie because he was distracted by the other men that were coming toward him. He said he was struck with rocks and a stick, which he believed came from the nearby fence. White said that one or more of the men had him on the ground, at which time he reached up and stabbed Canchola. The jury found White guilty as charged. He now appeals.

**DISCUSSION AND DECISION**

6

At the core of White's argument is the claim that "by excluding certain evidence in regards to the attack on [McKenzie], as well as the evidence of [White's] medical condition, the trial court deprived him of his fundamental right to present a defense." *Appellant's Br*. at 11-12. As we have explained,

> A valid claim of self-defense is a legal justification for an otherwise criminal act. A person is justified in using reasonable force against another person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force. Ind. Code § 35-41-3-2. In order to prevail on such a claim, the defendant must show that he: (1) was in a place where he had a right to be; (2) did not provoke, instigate, or participate willingly in the violence; and (3) had a reasonable fear of death or great bodily harm. An initial aggressor or a mutual combatant, whether or not the initial aggressor, must withdraw from the encounter and communicate the intent to do so to the other person, before he may claim self-defense. When a claim of self-defense is raised and finds support in the evidence, the State has the burden of negating at least one of the necessary elements. The State can rebut the defendant's claim of self-defense by relying on the evidence of its case-in-chief.

*Kimbrough v. State*, 911 N.E.2d 621, 635 (Ind. Ct. App. 2009) (internal citations omitted).

White argues that the trial court erred when it excluded: (1) evidence regarding Corporal Chrobot's investigation of the incident, including photographs of the bicycle that White maintains was thrown at McKenzie and pictures of McKenzie; and (2) evidence concerning White's pre-existing medical condition that required him to wear a colostomy bag. The trial court's discretion to admit or exclude evidence is broad, and it will not be reversed absent an abuse of that discretion. *Sudberry v. State*, 982 N.E.2d 475, 480 (Ind. Ct. App. 2013). The trial court abuses its discretion if its evidentiary ruling is clearly against the logic, facts, and circumstances before it. *Id.* A claim of error in the exclusion or admission of evidence will not prevail on appeal unless the error affects the substantial

7

rights of the moving party. *Lush v. State*, 783 N.E.2d 1191, 1194 (Ind. Ct. App. 2003).

## 1. Police Investigation

White maintains that "the actions he took against Canchola," *i.e.*, stabbing him, were for the benefit of protecting himself and McKenzie, who were "under attack," and because the trial court limited the evidence he could present regarding McKenzie's injuries from the bike being thrown at her, he was deprived of a full opportunity to present his claim of self-defense. *Appellant's Br.* at 11, 14. Specifically, White asserts that the trial court erred by precluding Corporal Chrobot from testifying in detail about the pictures he took of the bicycle, including the size of the tire tread, and from testifying about pictures he took of McKenzie, which White introduced for the purpose of illustrating injuries she sustained or marks to her shirt from the bike being thrown at her. In limiting the scope of Corporal Chrobot's testimony, the trial court determined that it was not relevant and was prejudicial to the State. "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ind. Evidence Rule 401; *Lush*, 783 N.E.2d at 1195. Relevant evidence should be excluded if the trial court determines that the probative value of the evidence is substantially outweighed by its prejudicial effect. Evid. R. 403. For several reasons, we discern no trial court error occurred here.

As an initial matter, and as the State notes, White did not make an offer of proof with respect to the now-challenged excluded testimony. An offer of proof is required to preserve an error in the exclusion of a witness's testimony. Evid. R. 103(a)(2); *Dylak v.*

8

*State*, 850 N.E.2d 401, 408 (Ind. Ct. App. 2006), *trans. denied*. An offer of proof allows the trial and appellate courts to determine the admissibility of the testimony, as well as the potential for prejudice if it is excluded. *Dylak*, 850 N.E.2d at 408. Having failed to make an offer of proof, White has waived the claim of error regarding the exclusion of Corporal Chrobot's testimony.

Waiver notwithstanding, we find that, although White repeats the refrain that the exclusion denied him a full opportunity to present his defense, he fails to explain to us with any specificity the importance of any additional testimony from Corporal Chrobot regarding the bicycle or McKenzie's claimed injuries. Here, the jury heard Corporal Chrobot testify that, as part of his investigation, he photographed the bicycle found in the street near the scene and, thereafter, photographed McKenzie. He also explained that the ruler positioned in the picture with the bicycle was used to measure the size of the bicycle's tire treads. *Tr*. at 338, 346. At the point when White's counsel sought admission of the photographs of the bicycle into evidence, the State requested and received permission to voir dire the witness and elicited testimony that the bicycle was found not in the vacant lot, but in a nearby street, at which time the State objected on relevancy grounds. Counsel for White did not concede that the photographs were not relevant but indicated that, relevance issues aside, "since [Corporal Chrobot] was the one that took the pictures[,] I wanted to lay the foundation at least that he had taken these pictures." *Id*. at 351. This was accomplished, as the jury heard Corporal Chrobot say that he took the photographs. The trial court sustained the State's relevancy objection, excluding the pictures, but the trial court indicated it would "revisit" the matter when McKenzie "testifies with regard to the bike,"

9

but cautioning that "you're going to have to convince me how that's relevant," considering White – not McKenzie – was on trial and claiming self-defense. *Id.* at 351-52.

With regard to the pictures of McKenzie, counsel for White showed Corporal Chrobot the pictures of McKenzie, which Corporal Chrobot had taken during his investigation, and counsel asked him about the significance of the ruler that was being held in the pictures near McKenzie. The State again objected, arguing that White was attempting to have Corporal Chrobot testify about whether McKenzie was or was not hit by the bike, based on marks appearing on McKenzie's shirt and hands. White's counsel responded that he could elicit the desired information from McKenzie during her testimony to follow, and he thereby essentially withdrew the question.

Thereafter, McKenzie testified, stating that, during the altercation that ensued when she and White returned to the vacant lot, a bike was thrown at her, "four or five times." *Id.* at 503. She said it hit her in the hand and arm, and as she tried to deflect it, the bicycle bounced and hit her forehead leaving a small knot, and it also left tread marks on her shirt. During her testimony, a picture of the bicycle and five pictures of McKenzie, all of which were taken by Corporal Chrobot, were admitted into evidence and published to the jury. The pictures of McKenzie showed her shirt, hand, wrist, and forehead, and four of those photographs included a ruler being held next to what she identified as tire tread marks from the bike. White fails to explain how any additional information by Corporal Chrobot, who did not witness the incident, would have been relevant or aided his case. The trial court correctly excluded Corporal Chrobot's testimony.

Furthermore, even if the evidence was improperly excluded, any error was harmless,

10

as it was cumulative of other properly admitted testimony. A claim of error in the exclusion or admission of evidence will not prevail on appeal unless the error affects the substantial rights of the moving party. *Lush*, 783 N.E.2d at 1194. White has failed to persuade us that the exclusion of further or more detailed testimony by Corporal Chrobot regarding the photographs of the bike and of McKenzie affected his substantial rights.

### 2. Medical Condition

White also challenges the trial court's decision to limit the scope of any testimony regarding White's health at the time of the fight. By granting the State's motions in limine, the trial court precluded White and McKenzie from testifying that White, at the time of the incident, suffered from medical conditions related to his colon and was wearing a colostomy bag; however, the trial court allowed them to testify that White had health-related "issues." *Tr.* at 417. The trial court found that any additional or more specific information was irrelevant to White's claim of self-defense and was inflammatory and unduly prejudicial. White argues that because of the evidentiary limitations that the trial court imposed, he was denied his right to fully present his claim of self-defense.

Initially, we note some concern about whether White was given a full opportunity to make a complete offer of proof on the matter. The purpose of an offer of proof is to convey the point of the witness's testimony and provide the trial judge the opportunity to reconsider the evidentiary ruling. *State v. Wilson,* 836 N.E.2d 407, 409 (Ind. 2005). Equally important, the offer of proof preserves the issue for review by the appellate court. *Id.* To accomplish these two purposes, an offer of proof must be sufficiently specific to allow the trial court to determine whether the evidence is admissible and to allow an

11

appellate court to review the correctness of the trial court's ruling and whether any error was prejudicial. *Id.* An offer of proof should show the facts sought to be proved, the relevance of that evidence, and the answer to any objection to exclusion of the evidence. *Id.* at 410.

Our review of the record before us reveals some discussion between White's counsel and the trial court, which indicated that White wanted the jury to know that Canchola picked on White because he wore a colostomy bag and that the colostomy bag may have come off during the fight. *Id.* at 415-16. The trial court appears to have viewed counsel's remarks as an adequate offer of proof, or at least sufficient in terms of allowing the trial court to make a determination regarding the relevance of the testimony. *Id.* at 417 ("I'll give you a chance to make an offer of proof, but quite frankly, you've already done so right now."). We recognize that such an explanation by White's counsel indeed may have been sufficient to constitute an offer of proof. *See Duso v. State*, 866 N.E.2d 321, 324 (Ind. Ct. App. 2007) (counsel made offer to prove by stating what he believed substance of defendant's testimony would be, and question and answer format was not necessary). Nevertheless, we observe that there were a number of additional exchanges between White's counsel and the trial court, where counsel expressly requested permission to make an offer of proof with White concerning proposed testimony about the colostomy bag or medical condition. *Tr.* at 422-23, 465, 468-69. Each time, the trial court indicated it would allow it and assured counsel that they would be given an opportunity to make the offer of proof at a later point in the trial. *Id.* at 423, 468-69. Eventually, it was agreed that the offer of proof could take place after White's testimony, but before the final instructions

12

were given. *Id*. at 468. For whatever reason, the offer of proof did not occur. Therefoare, we do not know exactly what White's testimony would have been.

As we have recognized, it is reversible error for trial court to deny a party the opportunity to explain the substance, relevance, and admissibility of excluded evidence with an offer of proof. *Duso*, 866 N.E.2d at 324. That said, although we are troubled by the fact that counsel repeatedly asked to make an offer of proof and that it did not happen, we do not find that White was denied the opportunity to make the offer of proof. The trial court agreed to it, but postponed its occurrence in order to maintain order of testimony and witnesses, *i.e*. avoid making the offer of proof before the witness even testifies, and in deference to jury and time management considerations. We find that the trial court's decision to postpone the offer of proof until White testified was reasonable, and ultimately, it was White's obligation to present that offer of proof at the agreed time. Because he did not do so, our review is whether the exclusion of the evidence concerning his colostomy bag, and/or medical conditions related to it, was fundamental error. *Young v. State*, 746 N.E.2d 920, 924 (Ind. 2001) (failure to make offer of proof of omitted evidence renders any claimed error unavailable on appeal unless it rises to level of fundamental error). The fundamental error doctrine is an extremely narrow doctrine and "applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *McBride v. State*, 992 N.E.2d 912, 918 (Ind. Ct. App. 2013), *trans. denied*. White seems to suggest that having a colostomy bag was critical to his defense because it explained why McKenzie became angry and went to confront the men and, further, established that, given

13

his "significant medical condition," White had a particular fear of harm or death, such that he acted reasonably when he stabbed Canchola. *Appellant's Br*. at 15.

Here, even with the trial court's limitation on the testimony, the jury heard that White suffered from medical "issues," which caused McKenzie to become particularly upset and angry because she felt the men who punched or "jumped on" White were picking on him. *Tr*. at 431. The trial court found, and we agree, that the specific nature of those medical issues was not relevant to White's claim of self-defense. That is, it did not matter whether the medical issue was that White had a colostomy bag or a heart condition or some other ailment. The jury heard both McKenzie and White testify as to their version of events that day, and the jury was free to consider that testimony in reaching its verdict. Although White claims the stabbing was in self-defense, and that he and McKenzie returned to the lot "to make peace" or "talk it out," White was carrying two decorative daggers at the time. *Id*. at 545, 550. A fight ensued, in which sticks, rocks, and even a bicycle, were thrown, and White stabbed Canchola with a knife. White ran home and hid in his basement crawl space. When police found White, he did not ask for medical assistance or treatment. Later, at the police station, White did ask for medical treatment and was transported to the hospital, where he was treated for various cuts and abrasions to his arm, shoulder, wrist, hand, and head, the pictures of which were admitted at trial. White gave no testimony to indicate he was treated for any pre-existing medical "issues." White has failed to establish that he was denied his opportunity to fully present his claim of self-defense, and the trial court correctly excluded evidence of White's specific medical condition. Affirmed.

FRIEDLANDER, J., and CRONE, J., concur.

14